# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

**JEFFREY ANTIDORMI,**

                **Plaintiff,**

       **v.**

**NATIONAL RAILROAD
PASSENGER CORP.,**

                **Defendant.**

_____

**1:18-cv-1344
(GLS/CFH)**

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **FOR THE PLAINTIFF:** | |
| Shapero Roloff Co., LPA | ANDREW JOHN THOMSPON, |
| U.S. Bank Centre | ESQ. |
| 1350 Euclid Ave., Suite 1550 | |
| Cleveland, OH 44115 | |
| | |
| Flynn & Wietzke, P.C. | MARC T. WIETZKE, ESQ. |
| 1205 Franklin Ave, Suite 370 | |
| Garden City, NY 11530 | |
| | |
| **FOR THE DEFENDANT:** | |
| Littler, Mendelson Law Firm | JACQUELINE P. POLITO, ESQ. |
| 375 Woodcliff Drive, 2nd Floor | PAMELA S.C. REYNOLDS, ESQ. |
| Fairport, NY 14450 | |

**Gary L. Sharpe
Senior District Judge**

# MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff Jeffrey Antidormi brings this action under Title I of the Americans with Disabilities Act[1] (ADA) and Section 504 of the Rehabilitation Act[2] against his employer, defendant National Railroad Passenger Corp. (hereinafter "Amtrak"). (Compl., Dkt. No. 1.) Antidormi alleges that Amtrak discriminated against him when it demoted him due to a vision deficiency and later retaliated against him. (*Id.* at ¶¶ 39-60.) Pending is Amtrak's motion to dismiss, (Dkt. No. 9), which is granted in part and denied in part for the following reasons.

## II. Background

### A. Facts[3]

Antidormi is deuteranomalous; that is, his vision suffers from a mild form of color deficiency. (Compl. ¶ 10.) When this condition stopped him from passing the Ishihira Vision Test as part of Amtrak's pre-employment

---

[1] *See* 42 U.S.C. §§ 12101-17.

[2] *See* 29 U.S.C. § 794.

[3] Unless otherwise noted, the facts are drawn from the complaint and presented in the light most favorable to Antidormi.

physical exam, Amtrak allowed him to take a secondary color vision acuity test.  (*Id.* ¶ 11.)  He passed and began working for Amtrak as an assistant conductor[4] in October 2013.  (*Id.* ¶¶ 9, 11.)  Four years later, Amtrak promoted him to conductor.[5]  (*Id.* ¶ 9.)  Despite his condition, he "can safely and effectively perform all of the essential functions of his job as a [c]onductor or [a]ssistant [c]onductor" and has worked both positions without incident.  (*Id.* ¶¶ 19, 35.)  Moreover, throughout his career, routine physical exams—including evaluation of his color vision acuity—found him medically qualified to work without limitation.  (*Id.* ¶ 12.)  He also passed annual "Block Testing," which included signal examinations.  (*Id.* ¶ 13.)

"On or about October 16, 2013, Amtrak required [Antidormi] to take a color vision test as a part of the newly[-]implemented conductor certification requirements[.]"  (*Id.* ¶ 15); *see* 49 C.F.R. § 242.117 (requiring railroads, as of January 1, 2012, to ensure that its employees meet certain visual acuity thresholds before recertification).  Specifically, Antidormi "was

---

[4] "[T]he position of [a]ssistant [c]onductor does not require the ability to differentiate signals."  (Compl. ¶ 19.)

[5] "The conductor is in charge of the movement of the train and his [or her] duties include the interpretation of railroad signals."  (Compl. ¶ 20.)

asked to take an Ishihira Plate Test, as opposed to the secondary color vision acuity test he had passed throughout his employment." (Compl. ¶ 15.) He failed the test. (*Id.*) "On or about December 9, 2013, [Antidormi] was given a field vision test to determine his ability to differentiate colors in railroad signals." (*Id.* ¶ 16.) The field test used specially-constructed signals instead of signals used in the zone where he worked. (*Id.* ¶¶ 14, 16-17.) He failed that test as well. (*Id.* ¶ 17.)

On December 23, 2013, Antidormi sought reconsideration from Amtrak of his field test failure. (*Id.* ¶ 19); *see* 49 C.F.R. § 242.401(a) ("A railroad shall notify a candidate for certification or recertification of information known to the railroad that forms the basis for denying the person certification and provide the person a reasonable opportunity to explain or rebut that adverse information in writing prior to denying certification."). He also requested that Amtrak make an accommodation and allow him to work as an assistant conductor. (*Id.* ¶ 19.) "On January 21, 2014, Amtrak reiterated its denial of conductor certification," because, in its opinion, Antidormi's reconsideration request "did not provide any basis to overturn the original determination that [he] failed to meet the vision acuity standards outlined in 49 C[.]F[.]R[.] [§] 242.117." (*Id.* ¶ 21

(internal quotation marks omitted).)  Amtrak also denied Antidormi's request to work as an assistant conductor.  (*Id.* ¶ 22.)

In April 2014, Antidormi filed a "Petition for Review of Certification Revocation" with the Federal Railroad Administration Operating Crew Review Board (hereinafter the "Review Board"[6]), which "sought an additional field test under conditions that allowed him to demonstrate that he can safely perform the duties of [c]onductor, or in the alternative, conditional certification that would allow him to work as an [a]ssistant [c]onductor."  (*Id.* ¶ 24.)  The Review Board found that Amtrak misinterpreted 49 C.F.R. § 242.117 by basing its decision solely on Antidormi's failure to meet vision acuity standards without considering whether a limited, conditional certification was appropriate.  (Dkt. No. 18, Attach. 5 at 7.[7])  By way of example, the Review Board noted that "a

---

[6] The Review Board has the authority to hear petitions from "[a]ny person who has been denied certification, denied recertification, or has had his or her certification revoked and believes that a railroad incorrectly determined that he or she failed to meet the certification requirements[.]" 49 C.F.R. § 242.501.

[7] The court properly considers the Review Board's decision at this stage because the complaint "relies heavily upon its terms and effect, which renders the document integral to [it]."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks and citation omitted).

conditional certification . . . might include a candidate with a minor color vision deficiency being certified as a conductor who may operate solely . . . in territories that contain only one or few color-based signals and where a crewmember could assist the conductor in interpreting the few color-based signals." (*Id.*)  The Review Board also found that "[b]ecause of the lack of adequate records and transparency in the decision-making process, [it could not] determine whether Amtrak meant to apply a more stringent requirement in making its denial decision or . . . misread[] [the] regulations as the more stringent requirement." (*Id.* at 8.)  The Review Board further criticized Amtrak's decision-making process:

> If a railroad intends to implement a system-wide type test for an examinee who has not previously worked system-wide, the railroad should provide its rationale for doing so.  It is not acceptable for a railroad . . . to inform an examinee that the railroad must ignore a demonstrated positive safety record with a limited work arrangement because [federal] regulations apply a stricter standard, as that is not a true statement.

*Id.* at 9-10 (internal quotation and citation omitted).  Accordingly, the Review Board remanded the matter and instructed Amtrak to issue a new decision regarding Antidormi's certification.  (*Id.* at 10.)

In March 2015, Amtrak responded to the remand by stating "that it complied with its own medical standards and federal regulations," and

"[Antidormi] failed to prove that he can meet those color vision acuity standards." (*Id.* ¶ 31.) But, according to Antidormi, Amtrak "did not address the reasons, if any, that [Antidormi] could not work as a [c]onductor or [a]ssistant [c]onductor safely, with or without a conditional certification." (*Id.*)

Thereafter, Antidormi again requested that Amtrak certify him to work as a conductor or grant him conditional certification that would allow him to work as an assistant conductor. (*Id.* ¶ 32a.[8]) On September 22, 2016, Amtrak refused his request. (*Id.* ¶ 33a.) Instead, Amtrak demoted him to baggage handler, a position "at the bottom of the seniority roster at a significant reduction in wages." (*Id.* ¶¶ 23, 33a.)

Antidormi cross-filed a charge of discrimination with the Delaware Department of Labor and the Equal Employment Opportunity Commission (EEOC) on March 14, 2017, (Dkt. No. 9, Attach. 1 at 4),[9] and received a

---

[8] The complaint contains two paragraphs numbered "32" and two paragraphs numbered "33." (Compl. at 6.) The court refers to the first sequential paragraph as "a" and the second as "b" in both instances.

[9] Antidormi's complaint alleges that he filed his EEOC complaint on or about March 4, 2017. (Compl. ¶ 32b.) However, the EEOC complaint itself is dated March 14, 2017. (Dkt. No. 9, Attach. 1 at 4.) The court accepts the filing date in the EEOC complaint, which is properly considered at this stage. *See Morris v. David Lerner Assocs.*, 680 F.

"right to sue" letter on August 18, 2018, (Compl., Attach.1).

## B.   <u>Procedural History</u>

Antidormi commenced this action on November 15, 2018. (Compl.) He asserts an ADA discrimination claim, (*id.* ¶¶ 39-45), ADA retaliation claim, (*id.* ¶¶ 46-51), and a Section 504 discrimination claim, (*id.* ¶¶ 52-60). He seeks compensatory and punitive damages, declaratory and injunctive relief, and attorney's fees and costs. (*Id.* at 9.) On January 30, 2019, Amtrak filed the pending motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 9.)

## III.   <u>Standard of Review</u>

The standard of review under Fed. R. Civ. P. 12(b)(6) is well settled and will not be repeated here. For a full discussion of the standard, the court refers the parties to its prior decision in *Mills-Sanchez v. Research Found. for State Univ. of N.Y.*, 1:18-cv-723, 2019 WL 2549726, at *4-5 (N.D.N.Y. June 20, 2019), *appeal filed*, No. 19-2405 (2d Cir. Aug. 6, 2019).

## IV.   <u>Discussion</u>

---------------------

Supp. 2d 430, 436 (E.D.N.Y. 2010) (recognizing "EEOC charges and right-to-sue letters are public documents that may be considered in a motion to dismiss without converting the action to a motion for summary judgment.") (internal quotation marks and citation omitted).

## A.     Exhaustion of Administrative Remedies

"Before commencing an action in federal court alleging violations

of . . . the ADA, a plaintiff must first file a timely charge with the EEOC."

*Hamzik v. Office for People with Developmental Disabilities*, 859 F. Supp.

2d 265, 277 (N.D.N.Y. 2012) (internal citations omitted).  That is, the

plaintiff "generally must file a charge of discrimination with the EEOC within

three hundred days after the alleged unlawful employment practice

occurred."  *Duplan v. City of New York*, 888 F.3d 612, 621 & n.7 (2d Cir.

2018) (internal quotation marks and citation omitted).  Under the continuing

violation doctrine, "if a . . . plaintiff files an EEOC charge that is timely as to

any incident of discrimination in furtherance of an ongoing policy of

discrimination, [then] all claims of acts of discrimination under that policy

will be timely even if they would be untimely standing alone."  *Chin v. Port

Auth. of N.Y. & N.J.*, 685 F.3d 135, 155-56 (2d Cir. 2012) (internal

quotation marks and citations omitted).  However, the doctrine "is

disfavored and will be applied only upon a showing of compelling

circumstances."  *Abboud v. County of Onondaga*, 341 F. Supp. 3d 164,

177 (N.D.N.Y. 2018) (internal quotation marks and citations omitted).

Additionally, the doctrine does not apply "to discrete unlawful acts, even

where those discrete acts are part of a serial violation." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (internal quotation marks and citation omitted).

"In addition to timeliness, the exhaustion requirements also mandate that the claims asserted in federal court be identical or 'reasonably related' to those filed with the EEOC." *Saaidi v. CFAS, LLC*, 740 F. Supp. 2d 357, 363 (N.D.N.Y. 2010) (internal citation omitted). "[T]he reasonably related doctrine does not excuse a plaintiff's failure to include allegations in his administrative complaint where those allegations pertained to conduct that had occurred before the administrative complain[t] was filed." *Guerrero v. FJC Sec. Servs. Inc.*, No. 10 Civ. 9027, 2012 WL 2053535, at *4 (S.D.N.Y. June 5, 2012) (internal quotation marks and citation omitted). Similarly, "'reasonably related' retaliation claims are excused from the exhaustion requirement *only* if they arise during the pendency of an EEOC investigation *or* a timely filed federal case." *Duplan*, 888 F.3d at 624.

Here, Antidormi instituted proceedings with a state agency and the EEOC on March 14, 2017. (Dkt. No. 9, Attach. 1 at 4.) Accordingly, any conduct occurring prior to May 18, 2016 was not properly within the EEOC charge. *See Duplan*, 888 F.3d at 621 & n.7. Contrary to Antidormi's

arguments, (Dkt. No. 18 at 8-10), the continuing violation doctrine does not apply to any of Amtrak's pre-May 18, 2016 conduct because it consisted of discrete acts—even if they were part of a serial ADA violation. *See Gonzalez*, 802 F.3d at 220. Moreover, Antidormi offers no compelling reasons to apply this disfavored doctrine. *See Abboud*, 341 F. Supp. 3d at 177. Furthermore, the reasonably related doctrine cannot save any of the conduct occurring prior to May 18, 2016. *See Guerrero*, 2012 WL 2053535, at *4. Accordingly, the only adverse employment actions that may form the basis of Antidormi's claims occurred on September 22, 2016, when Amtrak denied his certification requests and demoted him to baggage handler.[10] (Compl. ¶¶ 23, 32a, 33a.)

Likewise, two of the protected activities Antidormi relies on to support his retaliation claim—his December 2013 request for accommodation and his April 2014 petition to the Review Board—were not mentioned in the EEOC charge and cannot be saved by the reasonably related doctrine. (*Compare* Compl. ¶¶ 19, 24, *with* Dkt. No. 9, Attach. 1 at 4); *see Duplan*, 888 F.3d at 624. That leaves only Antidormi's filing of the EEOC charge

---

[10] Amtrak's pre-May 28, 2016 conduct may nonetheless serve as background evidence to support a properly-exhausted claim. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

itself, which—despite Amtrak's arguments to the contrary, (Dkt. No. 9, Attach. 2 at 8)—is clearly a protected activity that may support a retaliation claim.  *See Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 232 (E.D.N.Y. 2016).

## B.  <u>Retaliation Claim</u>

To establish a prima facie case of retaliation, a plaintiff must show that: "(1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (internal citation omitted).  It is axiomatic that a plaintiff's protected activity must precede an adverse action in order to state a cognizable retaliation claim.  *See Braxton v. TWU Local 100*, 16-CV-9425, 2017 WL 6542500, at *3 (S.D.N.Y. Dec. 21, 2017); *Nakis v. Potter*, 422 F. Supp. 2d 398, 423 (S.D.N.Y. 2006).

Given that Antidormi's filing of the EEOC charge is the only protected activity immune from exhaustion issues, and he alleges no adverse employment action followed it, Antidormi fails to state a retaliation claim.  *See Braxton*, 2017 WL 6542500, at *3; *Nakis*, 422 F. Supp. 2d at 423.

12

Accordingly, this claim is dismissed.

**C.** **Discrimination Claim**

> [T]o establish a prima facie case under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.

*McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (internal

quotation marks and citation omitted).

> *1.* *Disabled Within the Meaning of the ADA*

First, Amtrak argues that Antidormi is not disabled under the ADA

because he fails to allege that Amtrak regarded him as having an

impairment that substantially limited a major life activity. (Dkt. No. 9,

Attach. 2 at 11-12.) In response, Antidormi concedes that his condition

does not substantially limit one or more major life activities, but he argues

that his complaint sufficiently alleges that Amtrak regarded him as

disabled. (Dkt. No. 18 at 11); *see* 42 U.S.C. § 12102(1)(A),(C) (defining

"disability" as "a physical or mental impairment that substantially limits one

or more major life activities of such individual" *or* "being regarded as having

such an impairment").

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102(3)(A).

In 2008, Congress amended the portion of the ADA relied on by Antidormi. ADA Amendments Act of 2008, Pub. L. 110–325,122 Stat. 3353 (2008). Although the current statutory language is not a model of clarity, Congress was clear that it was meant to overrule Supreme Court precedent that "narrowed the broad scope of protection intended to be afforded by the ADA." *Id.* at § 2(a)(4),(5); *see Widomski v. State Univ. of N.Y. (SUNY) at Orange*, 933 F. Supp. 2d 534, 542 (S.D.N.Y. 2013), *aff'd*, 748 F.3d 471 (2d Cir. 2014). Thus, in cases involving post-2008 conduct, as here, a plaintiff need not allege facts to suggest that the impairment an employer mistakenly regarded him as having was one that substantially limited one or more major life activities. Instead, "plaintiffs need only demonstrate that the employer regarded them as impaired, whether or not that impairment is believed to limit a major life activity." *Palmieri v. City of Hartford*, 947 F. Supp. 2d 187, 200 (D. Conn. 2013) (citing *Hilton v. Wright*,

673 F.3d 120, 129 (2d Cir. 2012)).

Consequently, Amtrak's argument fails because it relies upon cases that applied the old standard.  (Dkt. No. 9, Attach. 2 at 12 (citing *Francis v. City of Meriden*, 129 F.3d 281, 284 (2d Cir. 1997); *Amie v. Shinseki*, 806 F. Supp. 2d 641, 644 (W.D.N.Y. 2011); *Keating v. Gaffney*, 182 F. Supp. 2d 278, 286 (E.D.N.Y. 2001)).)

### 2.     *Otherwise Qualified*

Next, Amtrak argues that Antidormi's discrimination claim must fail because his deuteranomalous condition kept him from "demonstrat[ing] visual acuity," which was an essential function of his job.  (Dkt. No. 9, Attach. 2 at 13.)

The ADA prohibits employers from "using qualification standards, employment tests[,] or other selection criteria that screen out . . . an individual with a disability . . . unless the standard, test[,] or other selection criteria, as used by the [employer], is shown to be job-related for the position in question and is consistent with business necessity."  42 U.S.C. § 12112(b)(6).  This "business necessity" standard is "quite high": "the employer must . . . show that the asserted 'business necessity' is vital to the business," that "the examination or inquiry genuinely serves the

asserted business necessity[,] and that the request is no broader or more intrusive than necessary." *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 97-98 (2d Cir. 2003).

At this stage, given the Review Board's criticism of the stringent examinations conducted by Amtrak, (Dkt. No. 18, Attach. 5 at 7-11), it is far from clear that they were no broader or more intrusive than necessary. *See Conroy*, 333 F.3d 88 at 98. Furthermore, even if the examination was no broader than necessary, granting a reasonable accommodation may have eliminated the business necessity of demoting Antidormi based on his vision deficiency. (Dkt. No. 18, Attach. 5 at 7.) However, Amtrak never addressed the prospect of such a conditional certification. (Compl. ¶ 31.) Accordingly, this argument also fails.

### 3. *Causal Connection Between Disability and Adverse Employment Action*

Lastly, Amtrak argues that Antidormi's allegations do not give rise to an inference of discrimination because the adverse employment action was required when Antidormi could not demonstrate visual acuity in accordance with 49 C.F.R. § 242.117. (Dkt. No. 9, Attach. 2 at 14-15 (citing 29 C.F.R. § 1630.15(e) ("It may be a defense to a charge of discrimination . . . that a

challenged action is required or necessitated by another [f]ederal law or regulation, or that another [f]ederal law or regulation prohibits an action[.]")).) However, at this stage, this argument is belied by indications that Amtrak failed to comply with these federal regulations.[11] (Compl. ¶¶ 27-30; Dkt. No. 18, Attach. 5 at 4-11.)

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Amtrak's motion to dismiss (Dkt. No. 9) is **GRANTED IN PART** and **DENIED IN PART** as follows:

> **GRANTED** as it relates to Antidormi's (1) retaliation claim and (2) discrimination claim based on conduct occurring prior to May 18, 2016 or not contained within the EEOC charge; and
>
> **DENIED** in all other respects; and it is further

**ORDERED** that the parties contact Magistrate Judge Christian F.

───────────────────

[11] Amtrak also asserts that there is no inference of causation because Amtrak knew about Antidormi's condition since the start of his employment and employed him for a decade nonetheless. (Dkt. No. 9, Attach. 2 at 15 (citing Compl. ¶¶ 11-12).) However, Amtrak fails to develop this argument or cite a single case to support the notion that this precludes Antidormi's discrimination claim. Accordingly, this argument fails.

Hummel to schedule further proceedings in accordance with this

Memorandum-Decision and Order; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

September 3, 2019
Albany, New York

Gary L. Sharpe
U.S. District Judge